NUMBER 13-02-00360-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI B EDINBURG

 

TERRY BRANDT, M.D., RANDALL S. ZANE, M.D.,

AND MICHAEL J. BURKE, M.D.,                                                    Appellants,

 

                                                             v.

 

KELLEY BROOKE SURBER, INDIVIDUALLY

AND ON BEHALF OF THE ESTATE OF

WILLIAM TATE SURBER, DECEASED, AND

AS NEXT FRIEND OF LOREN BAILEY SURBER

AND NICHOLAS TATE SURBER, MINOR CHILDREN,

WALTER SIDNEY SURBER, AND MARGIE
SURBER,                  Appellees.

 

     On appeal from the 28th District Court of Nueces County,
Texas.

 

                               O P I N I O N

 

                Before Justices Hinojosa, Yañez,
and Castillo

                                      Opinion
by Justice Hinojosa

 








This is an appeal from the trial court=s judgment in a medical malpractice case that arose
from the death of William Tate Surber (ATate@).  Appellees,
Kelley Brooke Surber (ABrooke@), individually and on behalf of the Estate of
William Tate Surber, Deceased, and as next friend of Loren Bailey Surber and
Nicholas Tate Surber, minor children, Walter Sidney Surber, and Margie Surber,
sued appellants, Terry Brandt, M.D., Randall S. Zane M.D., and Michael J.
Burke, M.D., alleging that appellants= failure to order an angiogram following two
episodes of severe bleeding was the cause of Tate=s
death and amounted to medical malpractice. 
After nine days of testimony, a jury found in favor of appellees, and
the trial court rendered judgment in accordance with the jury=s findings. 
Drs. Brandt and Zane challenge the judgment in seven issues; Dr. Burke
challenges the judgment in three issues. 
We affirm.

                                                                I.  Background

Tate suffered from advanced allergic fungal
sinusitis.  On September 25, 1998, he underwent
surgery at Spohn Hospital in Corpus Christi, Texas, to remove polyps and other
fungal tissue from his sinus cavities. 
Surgery was performed by Dr. Brandt, an otolaryngologist, and Dr. Burke,
a neurosurgeon.  Near the end of surgery,
Tate began bleeding briskly from inside his sinus cavity.  In his operative report, Dr. Brandt dictated
that during the surgery,

both sphenoid sinuses were opened and then the intra
sinus septum was also removed.  The
sphenoid sinus on the right side was found to be extensive in its depth and in
lateral extension.  The left sphenoid
sinus was extensive in its vertical direction.

 

He
described that 

 








[w]hen
the nose was being suction[ed], spontaneous bleeding started on the right side
posteriorly.  This was way back in the
nose in the general area of the sphenoid sinus or posterior ethmoid area.  Fairly extensive brisk bleeding occurred in
this location from the lateral wall surface. 
Monopolar cauterization was attempted [by Dr. Brandt] without success,
and then the microscope was brought in and bipolar cauterization was done [by
Dr. Burke] with pituitary micro surgical instruments with satisfactory control
of bleeding.  Approximately 200 to 250
cc. of blood was lost during this episode.

 

The postoperative report described the
operative complications as Aincreased bleeding due to extensive polyploid
disease and bleeding close to the termination of the case from the right
posterior nose, nasopharynx and sphenoid sinus area requiring control with
electrocautery.@  Tate was
discharged from the hospital on September 29, 1998, and attended a follow-up
office visit with Dr. Brandt on October 1. 

On October 3, 1998,
Tate returned to the emergency room at Spohn Hospital due to heavy bleeding
from the right side of his nose and was admitted for Asevere epistaxis/post-operative hemorrhage.@  Dr. Zane, an
otolaryngologist who was on call for Dr. Brandt, performed a second surgery to
stop the bleeding.  The medical records
describe that Tate began to have  

brisk
bleeding from the right side of the nose initially and then from both sides of
the nose.  He went through 2 rolls of
toilet paper trying to control the bleeding, and this did not take care of
it.  It began to slow with some ice and
he was driven to the emergency room by his wife from Orange Grove.  On arrival he was hemodynamically stable with
some steady oozing from both sides of his nose.   

 

Tate was taken immediately to the
emergency room for examination under anesthesia.  Dr. Zane=s post-operative notes described that 








the
sphenoid sinus was identified and it was widely open with the posterior most
aspect of the septum having been removed. 
An obvious bleeding vessel was squirting from inside the sphenoid sinus
on the right lateral wall, a constant flow. This area was further cleaned with
suction and it appeared to be close to the region of the carotid canal.  Landmarks were poor inside the sinus because
of the amount of clot and because of the swollen remaining mucosa.  The sphenoid sinus was irrigated copiously
with saline giving a little bit better view. 
Then, under direct vision, the bleeding vessel was cauterized using the
bipolar cautery and around this lightly with the monopolar cautery.  This controlled the bleeding.

 

Dr. Zane characterized the procedure as Aendoscopic control of sphenoid sinus hemorrhage.@  Dr. Zane=s deposition testimony described the bleeding vessel
as being one to two millimeters and Astanding up like a garden hose@ and Asquirting across the sphenoid wall.@  Tate was released
from Spohn Hospital on October 6th.  He
saw Drs. Brandt and Burke, individually, for follow-up visits on October 15th,
and was released on that day to go back to work on light-duty. 

            On October 21, 1998, sometime after
11:00 p.m., Tate again began to bleed profusely from his nose.  Tate=s wife, Brooke, called Tate=s brother, Walter Sidney Surber, Jr. (ABuddy@), who lived nearby and asked him to drive Tate back
to Spohn Hospital from their home in Orange Grove, approximately 45 minutes
away.  En route, Tate continued bleeding
heavily and lost consciousness.  In
Orange Grove, Texas, Buddy passed an off-duty sheriff=s deputy and pulled over to request help.  At 12:15 a.m., the officers called for an
ambulance, while Buddy and Brooke attempted to perform CPR.  An ambulance and paramedics arrived on the
scene at 12:35 a.m.  At the time the
ambulance arrived, Tate had no pulse and no blood pressure.  EMS records reflect that Tate was in full
cardiac arrest and was hemorrhaging from his mouth and nasal cavity.  Tate was transported to Columbia Alice
Physician=s & Surgeon=s Hospital in Alice, Texas, where he was pronounced
dead.

                                      II.  Sufficiency of the Evidence

In the first five
issues of Drs. Brandt and Zane, and in Dr. Burke=s
first and second issues, appellants contend the evidence is legally and
factually insufficient to support the jury=s findings. 








                                                     A.  Standard
of Review

When we review a "no evidence" or legal sufficiency
of the evidence issue, we view the evidence in the light most favorable to the
finding of the disputed fact and disregard all evidence and inferences to the
contrary.  Bradford v. Vento, 48
S.W.3d 749, 754 (Tex. 2001).  We sustain
a no-evidence challenge only when the record discloses that (1) there is a
complete absence of evidence of a vital fact, (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, (3) the evidence offered to prove a vital fact is no more than a
mere scintilla, or (4) the evidence conclusively establishes the opposite of
the vital fact.  Merrell Dow Pharms.
v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). 
If there is more than a scintilla of evidence to support the finding,
the no-evidence challenge fails.  Stafford
v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987). 
More than a scintilla of evidence exists where the evidence supporting
the finding, as a whole, rises to a level that would enable reasonable and fair‑minded
people to differ in their conclusions.  Havner,
953 S.W.2d at 711.








When we review an "insufficient evidence"
or factual sufficiency of the evidence issue, we consider, weigh and examine
all of the evidence which supports or undermines the jury's finding.  Plas‑Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989).  We
review the evidence keeping in mind that it is the jury's role, not ours, to
judge the credibility of the evidence, to assign the weight to be given to
testimony, and to resolve inconsistencies within or conflicts among the
witnesses' testimony.  Pickett v.
Keene, 47 S.W.3d 67, 74 (Tex. App.BCorpus Christi 2001, pet. dism=d).  We set
aside the jury=s finding only when we find that the evidence
standing alone is too weak to support the finding, or that the finding is so
against the overwhelming weight of the evidence that it is manifestly unjust
and clearly wrong.  Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996).

To prevail on a medical malpractice claim, a party
is required to establish four elements: 
(1) a duty by the physician to act according to a certain standard of
care, (2) a breach of the applicable standard of care, (3) injury or harm to
the plaintiff, and (4) a causal connection between the breach of the applicable
standard of care and the injury or harm.  Krishnan v. Ramirez, 42 S.W.3d 205, 212
(Tex. App.BCorpus Christi 2001, pet. denied). 

                                                        B.  Proximate
Cause

We first address appellants= contention that the evidence establishing proximate
cause is legally and factually insufficient. 
To establish proximate cause, a plaintiff must prove both (1)
cause-in-fact, and (2) foreseeability.  Duff
v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). 


                                                               1.  Cause-in-Fact








To show cause‑in‑fact, appellees were
required to establish a causal connection between the injuries suffered and the
negligence of appellants based upon "reasonable medical probability,"
not mere conjecture, speculation, or possibility.  See Park Place Hosp. v. Estate of
Milo, 909 S.W.2d 508, 511 (Tex. 1995); Kramer v. Lewisville Mem=l Hosp.,
858 S.W.2d 397, 400 (Tex. 1993); Duff, 751 S.W.2d at 176.  The ultimate standard of proof on causation
is whether, by a preponderance of the evidence, the negligent act or omission
is shown to be a substantial factor in bringing about the harm and without
which the harm would not have occurred.  Park
Place Hosp., 909 S.W.2d at 511; Kramer, 858 S.W.2d at 400; Brownsville
Pediatric Ass=n v. Reyes,
68 S.W.3d 184, 188-89 (Tex. App.BCorpus Christi 2002, no pet.).  Reasonable probability is determined by the
substance and context of the opinion, and does not turn on semantics or on the
use of a particular term or phrase.  Arlington
Mem'l Hosp. Found., Inc. v. Baird, 991 S.W.2d 918, 922 (Tex. App.BFort Worth 1999, pet. denied) (citing Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex. 1995)).  Unless the medical treatment at issue is a
matter of common knowledge or is within the experience of the layman, expert
testimony is required to establish negligence. 
Hood v. Phillips, 554 S.W.2d 160, 165‑66 (Tex. 1977); see
also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46
S.W.3d 873, 876 (Tex. 2001) (recognizing necessity of expert testimony in
medical malpractice cases). 

The trial was marked by numerous factual
disputes.  The parties primarily
contested (1) whether the artery that bled during any or all of Tate=s bleeding episodes was the internal carotid artery
(AICA@), (2) whether there was a layer of bone between
Tate=s ICA and his sphenoid sinus, (3) whether an
angiogram would have shown any treatable abnormality, and (4) whether Tate died
of exsanguination due to hemorrhage or some other cause.  In their first four issues, Drs. Brandt and
Zane complain that the evidence resolving these disputes is legally and
factually insufficient.  In their fifth
issue, Drs. Brandt and Zane contend the evidence is legally and factually
insufficient to establish that the harm was foreseeable.  Drs. Brandt and Zane generally assert that by
failing to sufficiently establish these issues, appellees failed to establish
proximate cause.  In his second issue,
Dr. Burke contends the evidence is legally and factually insufficient to
establish proximate cause as a whole.








In support of their allegations, both sides relied
on the surgical records from Spohn Hospital, EMS records, emergency room
records from Alice Physicians & Surgeons Hospital, CT and MRI films
completed on September 6, 1998, the autopsy report, surgical notes and reports
completed by appellants, and the deposition testimony of appellants.  In addition, both sides used expert testimony
to explain the relevant anatomy, interpret the information contained in the
medical records, and draw conclusions therefrom.

Appellees offered the testimony of the following
expert witnesses: (1) neurosurgeon Arnulfo R. Garza-Vale, M.D.; (2)
otolaryngologist Douglas E. Mattox, M.D.; (3) otolaryngologist George Gates,
M.D.; (4) emergency room physician Allen Hackley, M.D.; and (5) forensic
pathologist Robert Bux, M.D.  In addition
to their own testimony, appellants also offered the testimony of the following
expert witnesses: (1) neurosurgeon Lee Vanderpool Ansell, M.D.; (2)
neuroradiologist Carlos Bazan, M.D.; (3) otolaryngologist Mike Bertino, M.D.;
and (4) forensic pathologist Lloyd White, M.D., M.E., the medical examiner who
conducted the autopsy on Tate.  

                                                   a.  Was the Bleeding Vessel the

                                                          Internal
Carotid Artery?

 

In their first issue, Drs. Brandt and Zane contend
the evidence is legally and factually insufficient to show that the bleeding
vessel was the ICA or a branch thereof. 
The ICA is one of the main arteries that supplies blood to the
brain.  It travels through the base of
the skull and passes directly behind the right lateral wall of the sphenoid
sinus, the sinus furthest back.  In
support of their claim that Tate died from a hemorrhage of his ICA, appellees
presented evidence that (1) the type of bleeding, (2) the location of the
bleeding, and (3) the speed at which Tate lost consciousness and died, all
indicate that the compromised vessel was the ICA or a branch thereof.

 








                                                             (1)
Type of Bleeding

Appellees claimed that the type of bleeding Tate
experienced during the first two surgeries was arterial bleeding.  The medical records show that Tate lost
approximately 200-250 cc. of blood during the first surgery and approximately
200-400 cc. of blood during the second surgery. 
Drs. Garza-Vale, Mattox, and Gates all testified that the brisk bleeding
described by appellants and the rapidity at which Tate lost such a significant
amount of blood indicate that the bleeding vessel was an artery and not a vein;
an artery pumps and squirts blood because it is under greater pressure, while a
vein will ooze.  Dr. Garza-Vale opined
that all three bleeds experienced by Tate meet the description of arterial
bleeds.  He further opined that the
descriptions given by the defendants indicate that the same vessel bled all
three times.  Dr. Mattox explained that
it is very unusual to encounter arterial bleeding in the sphenoid sinus, and
that there is no named vessel normally in the sphenoid sinus that fits the
description contained in Dr. Zane=s surgical report.

Dr. Gates opined that the bleeding vessel was most
likely the ICA because of the amount of bleeding described in the surgical
reports.  Dr. Gates further testified
that although he would not normally expect to find a named artery in the
sphenoid, and that no branches of the ICA are normally found in the sphenoid,
the ICA is the only possible source of the bleeding and of the one to two
millimeter vessel described by Dr. Zane in his surgical notes.

                                                         (2)
Location of Bleeding








Next, appellees claimed that the bleeding originated
from the right lateral wall of the sphenoid sinus, thus indicating that the
breached vessel was the ICA.  Experts for
both sides generally agreed that the ICA is located behind the right lateral
wall of the sphenoid; however, appellants disagree that this is the location
from where the bleeding originated. 
Experts for appellees testified that they took the postoperative reports
and deposition testimony of appellants at Aface value@ in determining that location of the bleeding.  

After the first bleed, Dr. Brandt described the
location of the bleeding as Away back in the nose in the general area of the
sphenoid sinus or posterior ethmoid area. 
Fairly extensive brisk bleeding occurred in this location from the
lateral wall surface.@  Appellees
also relied on Dr. Burke=s deposition testimony that as the spontaneous
bleeding  began, Dr. Brandt told him the
bleeding was coming from the area of the carotid canal.  Dr. Zane described the bleeding as Asquirting from inside the sphenoid sinus on the
right lateral wall.@

            Dr. Gates testified that, in addition
to the specific descriptions given by appellants, he used the entire context of
both surgeries to aid in his interpretation of the postoperative reports, and
in his opinion, Dr. Zane=s postoperative report clearly describes the bleed
as being located in the lateral wall of the sphenoid sinus, the area of the
ICA.  Dr. Mattox opined that, according
to his interpretation of the medical records, the defendants knew they had a
bleeding vessel in the area of the ICA, but they did not think it was the ICA
itself. 








Appellants strongly contested appellees= assessment of the location of the bleeding, arguing
that the location of the bleeding was not near where the ICA would have been
located.  Dr. Brandt testified that the
appellees= experts misconstrued his description of the
location of the bleeding during the first surgery.  He explained that because so many anatomical
landmarks were removed during Tate=s initial surgery, it was hard to accurately
describe exactly where the bleeding was; sinus cavities that were usually
separated were now one big open space. 
The area he was trying to describe was the location of one of the
separating structures that had been removed. 
He testified that the bleeding was not in any of the sinuses clearly,
but in this middle ground that was hard to describe.  He explained that he made three attempts to
describe where the bleeding was coming from: the nasopharynx sphenoid area,
sphenoid sinus posterior ethmoid area, and nasopharynx lateral sphenoid wall.

Dr. Burke testified that he agreed with Dr. Brandt=s description of the location of the bleed as being
in the junction of the sphenoid and ethmoid sinuses.  However, he explained that due to the removal
of important landmarks, it was difficult to determine location and, in his
opinion, depending on the angle, the bleeder could appear to be both inside the
sphenoid and outside the sphenoid. 
However, he testified that he was sure it was nowhere near the location
of the ICA, and he was also sure that no branches of the ICA go into the sphenoid.

Dr. Zane testified that the landmarks in Tate=s nose were poor and it was difficult to tell
exactly where the sphenoid sinus started because the front wall had been
removed.  However, he said that knew he
was near the area where the anterior sphenoid wall should have been and, in his
opinion, he was working just inside the sphenoid sinus; the structures he
needed to avoid, such as the optic nerve and the ICA, were further back.  He testified that he could see the area of
the carotid canal, but he was not in it. 









Drs. Brandt and Zane presented conflicting opinions
on the location of the bleeding vessel. 
Dr. Brandt opined that neither the first nor the second bleeding
episodes were in the sphenoid sinus, but were located in the lateral wall of
the nose.  Dr. Brandt further opined that
Dr. Zane was wrong when he said the bleed was in the sphenoid.  Dr. Brandt asserted he was in a better
position to determine the location of the bleeding because he was the one who
removed the anatomical landmarks during the initial surgery.

Dr. Zane maintained his original description of this
as a sphenoid sinus hemorrhage.  The
vessel was coming out right where the sphenoid sinus starts and it was
squirting into the sphenoid sinus.

Dr. Brandt explained that in earlier deposition
testimony relied upon by appellees= experts, in which he stated that he had told Dr.
Burke he was working in the area of the ICA, he was using the location of the
ICA to orient Dr. Burke to the general area of the nose he was in, and Aclose@ is a relative term. 
However, he was not actually close to the ICA at the time, and the ICA
was not a concern at the time.

Dr. Burke acknowledged that he and Dr. Brandt have
different recollections of what was said at Tate=s
first surgery.  Dr. Burke acknowledged
that at his first deposition, taken eleven months after Tate=s death, he had testified that Dr. Brandt had
mentioned to him that he was working in the area of the carotid canal.  However, he did not have any concerns that
the ICA was involved; had it been, there would have been Aan explosion@ of blood. 
When he looked into Tate=s nose, he saw a small pumping artery that in his
opinion was neither the ICA nor a branch of the ICA.

Dr. Ansell testified that due to the common sinus
cavity created by the first surgery, he did not think anyone could precisely
pinpoint the location of the bleeds or say whether they were working in any
particular sinus; nor could they pinpoint exactly which vessel had bled.  He acknowledged that Drs. Zane and Brandt had
both described specific locations, but in his opinion, the removal of landmarks
in the sinuses made it impossible for them to know exactly where the bleeding
occurred.








Dr. Bertino testified that from his reading of the
medical records, he understood the location of the bleeding vessel repaired by
Dr. Zane to be in the Aanterior lateral aspect of the sphenoid sinus@ (side and to the front), not the back half of the
sphenoid where the ICA would be.

                               (3)
Speed at which Tate Lost Consciousness and Died

Finally, appellees claimed that the speed at which
Tate lost consciousness and died make the ICA the only possible source of the
hemorrhage.  There were varying time
estimates as to how much time passed between when Tate began bleeding and when
he lost consciousness.  Tate=s wife, Brooke, and Buddy both recalled that Tate
began bleeding sometime after 11:00 p.m., though neither could specify an exact
time.  In addition, both testified that
under the circumstances, they were not keeping track of the amount of time that
was passing.  Appellees assert that,
given that Buddy lived only one-half mile away from Tate and Brooke, and the
speed at which he was driving (approximately 100 miles per hour), not much time
passed between when Tate began bleeding and when he lost consciousness in the
truck approximately thirteen miles away.  
Appellees assert that only a breach of the ICA could cause someone to
exsanguinate so quickly.  








Appellants argue that if the final hemorrhage had
been from the ICA, Tate would have lost consciousness and died much faster than
described.  In Dr. Ansell=s expert opinion, if there was a hole in the ICA
large enough for any blood to flow through, the wall of the ICA would likely
disintegrate quickly, leading to massive bleeding.  Generally a ruptured ICA would cause a person
to lose consciousness within seconds and exsanguinate within two to three
minutes, if the full size of the vessel is bleeding.  Dr. Ansell acknowledged that if the hole is
smaller, the bleed would take longer. 
However, he opined that with Tate=s sphenoid sinus opened as it was, there was nothing
to impede the flow from the ICA and Tate would have died within minutes.  Dr. Burke agreed that if the final bleeding
episode had been from the ICA , there was nothing to obstruct the flow of blood
and, in his opinion, Tate would have bled to death within minutes.  Dr. Bertino opined that if the ICA had blown
out, Tate would not have been conscious when they reached the city limits of
Orange Grove, approximately thirteen miles away.  In his opinion, if the ICA ruptures, the
person is going to be dead within 10-15 minutes.

However, Dr. Gates countered that the speed of
exsanguination described by appellants= experts of mere minutes was correct only when
dealing with a rupture of the ICA in the head or neck; a bleed from the ICA in
the sphenoid sinus would not cause death as quickly because of the size of the
location.  A rupture of the ICA in the
sphenoid is limited by the size of the sinus, and it would therefore take
longer for a person to exsanguinate.   

In opposition to appellees= theory, appellants argue that the size of the
vessel observed by appellants eliminated the ICA as the possible source of the
bleeding and made it more likely that it was the sphenopalatine artery (ASPA@).  Dr. Zane
testified that he could not only see the blood, but he could see the vessel that
it was coming from; it was an entire vessel, like looking at a garden hose, not
a discrete hole or the side of a vessel. 
The experts agreed that where the ICA courses behind the sphenoid, it is
larger than the  one to two millimeter
vessel described by appellants.  








Experts for both appellants and appellees agreed
that where the ICA courses through the sphenoid sinus, no branches of the ICA
have been described in the literature, nor have any of them observed any
aberrant branches of the ICA in that area. 
Dr. Mattox acknowledged that if Dr. Burke did get the vessel between the
prongs of the bipolar cautery, it was not the ICA itself; however, it was still
a vessel that was not supposed to be in the sphenoid.  He maintained that people do have anatomical
variations, especially in a nose that is inflamed and has excess vascular
supply.  Dr. Mattox further acknowledged
that while there may be some branches of the SPA that go to the sphenoid sinus,
it is not a major blood supply to the sphenoid sinus.  The SPA comes into the lateral wall of the
nose.  In removing the polyps, Dr. Brandt
would come across the septal branch of the SPA elsewhere in the nose, but not
in the sphenoid.  Dr. Mattox explained
that SPA bleeds can be scary and appear to be a lot of blood, but a person will
not bleed to death quickly from a bleed of the SPA.  Had the bleeding vessel been the SPA, Tate
would have had enough time to get to medical care.

In Dr. Gates= opinion, Dr. Zane=s
description of Aa discrete vessel standing up like a garden hose
squirting blood across the sinus@ could only be describing the ICA or a branch of the
ICA, despite his acknowledgment that it is uncommon for the carotid to have a
branch in that area.  In Tate=s situation, they were not dealing with the SPA
because the location is different. 
Further, he agreed that it was unlikely a person could bleed to death
from a bleed from the SPA, due to its small size.  Although a bleed of the SPA would be messy,
the pressure would drop sufficiently that Tate could have gotten to medical
attention before bleeding to death.








Drs. Ansell and White acknowledged that there are
discrete vessels that come off the ICA in the area behind the sphenoid;
however, they stressed that there are none that normally face the
sphenoid.  Dr. Ansell explained that
those vessels are not always present, and there is no evidence showing they
were present in Tate.  Dr. Bazan
acknowledged that when there is an inflammatory process involved, the body may
try to increase the blood flow to control the inflammation, perhaps leading to
the growth of new vessels or the increase in size of existing vessels.  However, in his opinion, the studies he saw
showed that Tate=s visible vessels were in the range of normal
positioning.  

Dr. Ansell testified that severance of the SPA could
result in exsanguination if the main trunk was opened, but he could not say
whether this happened in Tate=s case.  The
main trunk of the SPA is buried in the bone and is not in the sphenoid.  The only published cases where the trunk of
the sphenoid was severed are in cases where the bone was being removed.  Otherwise, the branches of the SPA in the
area of the sinuses are about 1mm or less. 









Further, appellants generally disagreed
regarding whether the same vessel was involved in all three bleeding
episodes.  Dr. Zane testified that in his
opinion, the bleeding came from the same area of the nose on all three
occasions, but he did not know if it came from the same vessel all three
times.  Drs. Ansell and Burke testified
that in their opinions, there were three different bleeds, all unrelated to
each other.  Dr. Burke specified that he
believed the description of what Dr. Zane saw during the second surgery
differed from what he saw during the first surgery.  Dr. Burke agreed with the description of the
location given by Dr. Zane in his post-operative report, and disagreed with Dr.
Brandt that the bleeds were all from the same place.  Dr. Bertino agreed that all three bleeds came
from the same area in the sphenoid, and that it is possible the same vessel
bled all three times.  He interpreted Dr.
Zane=s post operative report to describe a
branch of the SPA in the lining of the sphenoid sinus that started
bleeding.  However, because of all the
damage done to the structure of the sphenoid, in his opinion, it was impossible
for Dr. Zane to know if it was the SPA itself, a branch thereof, or something
else. 

Dr. Ansell added that in the area where
appellees claimed the ICA hemorrhaged, he believed the ICA was surrounded by
the cavernous sinus, a venous sinus that is full of blood and protected by a
tough membrane.  In his opinion, for the
ICA to have been injured in this area, the membrane of the cavernous sinus
would first have to be punctured, resulting in brisk venous bleeding which
could not be controlled with a bipolar cautery and was not described as having
occurred.

Dr. Bazan testified that he believed the
MRI showed the cavernous sinus surrounding the ICA in the area where the bleed
would have occurred in the ICA.  In
addition, Dr. White agreed that if the ICA had blown out near the sphenoid, the
cavernous sinus would be ruptured as well, and testified that during the
autopsy, he observed the cavernous sinus to be intact.  However, Dr. White also acknowledged that he
did not examine the ICA itself near the cavernous sinus or anywhere else.

Appellees= experts disagreed that the cavernous sinus would have to be breached
before the ICA could be reached.  Dr.
Gates testified that while the cavernous sinus surrounds the ICA in some areas,
depending on the location of the blow-out, a rupture of the ICA will not
necessarily affect the cavernous sinus.








It is the role of the jury to resolve
the inconsistencies in the testimony and judge the credibility of the
witnesses.  See Pickett, 47 S.W.3d
at 74.  We conclude that appellees
submitted more than a scintilla of evidence to resolve the issues in support of
a finding that the bleeding vessel was the ICA or a branch thereof.  In addition, we cannot say that the evidence
presented by appellants greatly outweighs that presented by appellees, such
that the verdict is clearly wrong or unjust. 
Accordingly, we conclude that the evidence is legally and factually
sufficient to support the jury=s finding that Tate=s bleeding episodes and final hemorrhage
were caused by a rupture of his ICA.  The
first issue of Drs. Brandt and Zane is overruled. 

                                             b.  Was there a Layer of Bone between

                                                  the
Sphenoid Sinus and the ICA?

 

In their second issue, Drs. Brandt and
Zane contend the evidence is legally and factually insufficient to show that
the layer of bone that typically separates the ICA from the sphenoid sinus was
absent.








In support of their claim that this
layer of bone was absent or so thin as to provide essentially no protection,
appellees submitted into evidence the MRI and CT films of Tate=s sinuses taken before the first
surgery.  In conjunction with the films,
appellees also presented the expert opinions of Drs. Mattox and Gates, who both
testified that according to their interpretation of the films, there appeared
to be a hole in the bony wall, leaving the ICA exposed in the sphenoid sinus
and vulnerable to injury.  Dr. Gates
noted that if there was any bone present, it was very thin and provided essentially
no protection to the ICA.  In addition,
Dr. Garza-Vale testified that infection such as Tate=s can destroy soft tissue in the area,
including adjacent bone.  He believed
that such erosion was visible on Tate=s CT and MRI scans and made it more
likely that an artery could be injured in the process of cleaning out the
sinuses.  In addition, appellees
presented undisputed testimony that in approximately four to five percent of
the population, that bone is anatomically absent.  We consider this to be more than a scintilla
of evidence.  Therefore, we hold the
evidence is legally sufficient to support the jury=s finding that there was not a layer of
bone protecting the ICA.

In opposition to appellees= position, Drs. Ansell and Bazan
testified that they could not tell from the MRI scans whether there was bone
present or not; however, they believed Tate had a very thin layer of bone
between the sphenoid and ICA.  Dr. Bazan
testified that MRI scans are not the best for showing thin bone because,
depending on how you photograph the area, thin bone may or may not appear.  Dr. Ansell explained that in situations where
a bone is not visible on the MRI films, any bone that is present is less than
.5mm thick.  

In addition, Dr. Ansell testified that
sometimes, through normal development, part of the ICA will actually form a
groove in the bony wall.  When this
happens, the ICA is not actually in the sphenoid, but there is a visible bulge
where the ICA is just on the other side of the bony wall.  Dr. Burke testified that, in his opinion, it
was apparent from the MRI films that the ICA was bulging into the sphenoid, but
he could not tell whether there was bone separating the ICA from the
sphenoid.  Drs. Bazan and Brandt opined
that the ICA did not appear to be bulging into the sphenoid on the MRI
films.  Dr. Brandt further testified
that, in his opinion, the CT scans showed the bone to be very thin in the area
in question, but that whether there was some bone, thin bone, or no bone
between the sphenoid sinus and the ICA is not really that important because he
stayed away from that area. 
Additionally, Drs. Bazan and Burke agreed that what appellees= experts identified as bone, they
believed to be the ophthalmic artery.








We conclude that this evidence does not
outweigh the evidence in favor of the jury=s finding.  Therefore, we hold the evidence is factually
sufficient to support the jury=s finding that there was not a layer of
bone protecting the ICA.  The second
issue of Drs. Brandt and Zane is overruled.

                                                    c.  What Would an Angiogram

                                                                  Have
Shown?

 

In their third issue, Drs. Brandt and
Zane contend the evidence is legally and factually insufficient to support the
jury=s finding that if an angiogram had been
performed, it would have shown a treatable condition. 

Dr. Garza-Vale explained that an
angiogram is a study in which a dye is injected into an artery so that the
vasculature will appear on regular x-rays films.  Typically, angiograms will show arteries as
small as a millimeter, but anything around a millimeter or smaller is very
difficult to see.  Sometimes arteries can
deviate from their normal path and angiograms are done to locate important
vascular anatomy before operating in an area close to large vessels.  Dr. Mattox further explained that angiograms
show abnormalities such as a dilation, an aneurysm, a pseudoaneurysm, or some
other kind of lesion, or the presence of an abnormal branch of a vessel. 








Dr. Gates explained that the current
generated from a cautery tool creates a coagulation effect that can be used to
seal a small vessel.   A bipolar cautery
is essentially like a pair of tweezers in which the current is controlled
between the tips instead of spreading to the surrounding tissue.  However, a monopolar cautery has a single hot
tip and a ground pad.  The current can
spread to surrounding tissue and, therefore, has a tendency to be
uncontrolled.  All the testifying experts
agreed that there is concern when using a monopolar cautery next to different
nerves, arteries and vessels.  When used
near a larger vessel such as the ICA, current from an electrocautery can weaken
the vessel walls, resulting in a pseudoaneurysm or some other abnormality.  Dr. Mattox testified that the use of a
monopolar cautery near the ICA causes a risk of damage, Aanything from very little [damage] to
rupturing the artery, depending on the time and current and how hard you were
pressing and a number of variables.@

Appellees= experts acknowledged that it was difficult to say exactly what an
angiogram would have shown because the test was not performed, but all shared
the opinion that an angiogram would have shown the abnormality that eventually
led to Tate=s death. 
Drs. Mattox and Gates testified that during both attempts to stop the
bleeding in Tate=s sinus, a monopolar cautery was used
close enough to the ICA to damage the vessel. 
The attempts at cauterization exposed the area to thermal damage
twice.  An unappreciated injury would
have shown up on an angiogram.  Dr. Gates
testified that he believed the efforts to repair the bleeding vessel during the
first and second surgeries, involving the use of both monopolar and bipolar
cauteries, compromised the ICA and increased the risk of compromise of that
vessel in the future.

Dr. Gates explained that this type of
damage would not have caused an immediate blow-out, but would have taken a few
weeks to show up.  Dr. Garza-Vale
explained that when damage such as an aneurysm or any pathology that changes
the integrity of an arterial wall occurs, although a clot may form to stop the
initial bleeding, the continuing repair process will break down the clot so the
artery opens up again.  For example, in
aneurysms, typically there will be a significant rebleed approximately three
weeks after the initial bleed. 

We conclude there is more than a
scintilla of evidence to support the jury=s finding that Tate suffered an arterial
injury that would have shown up on an angiogram if one had been performed.
Therefore, we hold the evidence is legally sufficient. 








While appellants and their experts did
not dispute the types of abnormalities revealed by angiograms, or that in
situations where these abnormalities occur the vessel does not blow-out until
several weeks later, appellants did disagree that electrocautery was used close
enough to Tate=s ICA to create a risk of any
damage.  Therefore, they argued, it would
be purely speculative to say what an angiogram would have shown. 

Dr. Ansell did not believe an aneurysm
or pseudoaneurysm occurred in this case, and stated that such damage is a rare
side effect of this type of surgery.  For
one to form, some damage must be done to the side of the artery that causes
some of the muscle cells to die.  He
agreed that if a doctor suspected at any time there was damage to the carotid,
the standard of care was to get an angiogram. 
He further testified that a vessel that has been cauterized with a
bipolar cautery will not appear on an angiogram because an angiogram will only
show vessels in which blood is currently flowing.

Dr. Bazan testified that an angiogram
will not always show a damaged vessel, and often would not be helpful in
showing a damaged vessel unless there was active bleeding going on.  In his experience, he does not recall doing
an angiogram to show a cauterized discrete bleeder such as that described by
the defendants.  In addition, because
there is a period of time after an injury during which the abnormality will not
show up on an angiogram, any abnormalities present in Tate may not have been
visible.  If an angiogram shows nothing
unusual the first time, it is not always standard practice to repeat it.  Generally, the decision to repeat is made by
the surgeons, not the radiologist.








Dr. Garza-Vale testified that in fifteen
to thirty percent of cases, an abnormality is visible in the first
angiogram.  He acknowledged that there is
no specific literature calling for sequential angiograms after cauterizing a
vessel or when dealing with fungal infections. 
However, he opined that after the second bleed, the situation changed
enough that further investigation was needed.

Dr. Zane testified that before surgery,
he was considering the possibility of an angiogram.  However, once he saw the bleeding vessel, he
no longer had any questions or thought there would be any benefit in doing an
angiogram.  Because he did not see much
benefit, he considered the risks too great just to look around.  Further, Dr. Brandt maintained that, because
he had not used the monopolar cautery anywhere near the ICA, there was no
possibility that a pseudoaneurysm was created. 


We cannot say that this evidence greatly
outweighs that presented by appellees such that the jury=s finding is clearly wrong or manifestly
unjust.  Therefore, we hold the evidence
is factually sufficient to support the jury=s finding that an angiogram would have shown a treatable
condition.  The third issue of Drs.
Brandt and Zane is overruled. 

                                                              d.  Cause of Death

In their fourth issue, Drs. Brandt and
Zane contend the evidence is legally and factually insufficient because
appellees failed to negate that Tate died of asphyxiation, not massive
exsanguination.  While a plaintiff is not
required to establish causation in terms of medical certainty, nor to
conclusively exclude every other reasonable hypothesis, Krishnan, 42
S.W.3d at 212, Aif there are other plausible causes of
the injury or condition that could be negated, the plaintiff must offer
evidence excluding those causes with reasonable certainty.@  Merrell
Dow, 953 S.W.2d at 720.








Gary Graham, the off-duty sheriff=s deputy that Buddy and Brooke stopped
and asked for help, testified that the Surbers reached the intersection in
Orange Grove around midnight.  When
Graham, a certified paramedic, approached the truck, Tate was bleeding
profusely from his nose and mouth, and was unconscious and unresponsive.  Once the ambulance arrived, he accompanied
the paramedics and reported that Tate had no pulse, no respirations, and no
heartbeat.  Tate continued bleeding and
when they performed chest compressions, massive amounts of blood came out of
Tate=s nose and mouth.  Graham testified that they tried several
times to intubate Tate but were unable to see the opening to the trachea due to
all the blood, but at no time did he see any blood clot in the trachea.  He further testified that they had trouble
establishing an IV because Tate=s vessels were closed off, in his
opinion due to a lack of blood in the extremities, and that Tate had no
capillary refill, also indicating no circulation in the extremities.  By the time the ambulance reached the city
limits of Alice, they stopped getting blood during chest compressions, and Tate
had essentially stopped bleeding.  Graham
testified that they suctioned approximately 800 cc. of blood from Tate, and he
further estimated there was another 1000 cc. of blood on the floor of the
truck, 200 cc. on the seat of the truck, and another 500 cc. on family members
and around the rest of the truck, for a total of 2500 cc. of blood, not
including whatever blood Tate lost at home.

David Lopez, Jr., one of the paramedics
who arrived to assist the Surbers, also estimated that they suctioned between
800 to 1000 cc. of blood while trying to establish an airway, and there
appeared to be an additional 1000 to 1500 cc. of blood in the truck.  The average adult has between 5000 and 6000
cc. blood volume, and the experts generally agreed that a loss of between 40 to
60 percent of that volume would cause unconsciousness and death.  Both Lopez and Graham believed Tate bled to
death. 








Emergency room records show that Tate
was dead upon arrival at Alice Physicians & Surgeons Hospital.  He had no circulation in his fingers, no
cardiac activity, no carotid pulse, no blood pressure, and exhibited no
respiratory activity.  In addition, he
exhibited severe acrocyanosis, blue coloring in the extremities, indicating
poor peripheral circulation. 
Acrocyanosis occurs late in the evolution of the shock caused by a
reduction in blood volume.  Dr. Hackley,
the emergency room physician on duty when Tate arrived at the hospital,
testified that he estimated the extent of blood loss experienced by Tate based
on reports from EMS personnel and observations of the amount of blood on family
members and on Tate=s body. 
He concluded that Tate died from massive exsanguination from a massive
oronasal hemorrhage.

In further support of massive
exsanguination, appellees presented the expert testimony of Dr. Robert Bux, a
forensic pathologist.  Dr. Bux concluded
that Tate bled to death.  He reached this
conclusion by taking into account the following:  (1) the circumstances surrounding the death;
(2) the amount of blood lost as evidenced by (a) photographs of Tate=s home where he started bleeding, (b)
reports from EMS of the amounts of blood in Tate=s brother=s vehicle, and (c) the amount of blood
in the oropharynx; and (3) the amount of time that it took Tate to die once he
started bleeding.

Dr. White testified that during the
autopsy, he found evidence of early hypoxic changes in the central nervous
system, indicating that there was a lack of oxygen to Tate=s brain at some point immediately prior
to his death.  Dr. White acknowledged
that this could be considered consistent with massive exsanguination.  However, he would not consider blood loss as
a possible cause of death without direct evidence of the actual amount of blood
that was lost; he would not rely on observations and estimates.  








We conclude the evidence supporting the
jury=s finding that Tate died from massive
exsanguination is more than a scintilla. 
Accordingly, we hold the evidence is legally sufficient.

Dr. Ansell testified it was his opinion
that Tate hemorrhaged until he lost consciousness, and then asphyxiated from
lack of airway control.  He further
opined that the acrocyanosis exhibited by Tate is inconsistent with someone
dying of exsanguination and explained that because oxygenated blood is red and
de-oxygenated blood is blue, when the blood reaching the extremities is
de-oxygenated, they turn blue.  The
significance of this in Tate=s case is that sometime after he was clinically
dead, blood was still reaching his extremities. 
If a person had exsanguinated, the body would be pasty white and waxy
all over.  In addition, the ability to
generate a pulse in the ER with chest compressions mitigates against death by
exsanguination in his opinion, because in order to generate a pulse with chest
compressions, a person needs at least fifty percent of the person=s circulating blood volume.

Dr. Bertino testified that he believed
Tate=s death was caused when a clot dislodged
from the sphenoid sinus and fell into his larynx.  It occluded Tate=s airway, irritated Tate=s vocal cords, causing a tight clamping
down of the vocal cords called a laryngospasm, and Tate either suffocated or
developed an arrhythmia and accompanying cardiac death.  Dr. Bertino acknowledged, however, that no
evidence of a blood clot in the larynx was found during the autopsy.








Drs. Burke and Zane both testified that
they could not say exactly how Tate died.  
Dr. Brandt acknowledged that during his initial deposition, he said he
believed that Tate had bled to death, but explained that opinion was based on
what he was told by Dr. Hackley and EMS personnel.  At trial, however, he considered
exsanguination to be inconsistent with what he knew; rather, he believed that
Tate had a massive nose bleed and asphyxiated. 
He testified that, while losing consciousness is consistent with someone
losing a lot of blood quickly, Tate was still bleeding well after he lost
consciousness.  Dr. Brandt considered
this to be inconsistent with someone having lost sixty percent of his blood
volume.  Dr. Brandt interpreted the inability
of the emergency technicians to intubate Tate as indication of a
laryngospasm.  While Tate still had
sufficient blood supply, there was no oxygen reaching his brain. 

            During cross-examination, Dr. White
testified that he had found no evidence of aspiration when he examined the
lungs and airways.  Normal lungs weigh
between 250-300 grams; Tate=s left lung weighed 380 grams and Tate=s right lung weighed 400 grams.  While the increased weight was due to the
presence of blood, that blood was due to common mild congestion and not
aspiration.  Dr. White opined that
testimony from Tate=s family and the EMT=s who worked on Tate reflect that chest
compressions and mouth-to-mouth resuscitation resulted in the rising and
falling of Tate=s chest, indicating there was a clear
pathway to the lungs and that no obstruction was preventing air from reaching
the lungs.  Further, had there been
occlusion of the airways, the blood would have been pushed into the lungs by
the efforts at resuscitation, and there was no such blood in the lungs. 

Dr. Bux testified that laryngospasms are
very rare.  He disagreed that one had
occurred in this case and might have caused Tate=s death.  The volume of
blood in Tate=s lungs was too small to have caused
Tate to aspirate.  The airway was still
open and there was an insufficient amount of blood in Tate=s lungs to cause him to suffocate. 








We do not consider the controverting
evidence presented by appellants to significantly outweigh the evidence showing
that Tate died from massive exsanguination. 
Further, appellees offered sufficient evidence for the jury to negate
with reasonable certainty asphyxiation as a plausible cause of death.  Accordingly, we conclude the evidence is
factually sufficient to support a finding that Tate died from massive
exsanguination.  The fourth issue of Drs.
Brandt and Zane is overruled.    

                                                           C.  Foreseeability

In their fifth issue, Drs. Brandt and
Zane contend the evidence is legally and factually insufficient to support the
jury=s finding that the harm to Tate was
foreseeable.

For an injury to be foreseeable, Aa person of ordinary intelligence should
have anticipated the danger created by a negligent act or omission.@  Doe
v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995)
(citing Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 549-50 (Tex.
1985)).  Harm is foreseeable Aif the injury >might reasonably have been contemplated= as a result of the conduct.@  Id.  (citing McClure v. Allied Stores of Tex.,
Inc., 608 S.W.2d 901, 903 (Tex. 1980)). 
However, foreseeability requires more than someone, viewing the facts in
retrospect, theorizing an extraordinary sequence of events whereby the
defendant's conduct brings about the injury. 
Id.  (citing Restatement (Second) of Torts ' 435(2) (1965)).

All the testifying experts agreed that
(1) typically, when a vessel is cauterized with a bipolar cautery, it is not
expected to rebleed, and (2) an angiogram was not indicated after the bleeding
incident during Tate=s initial surgery.  However, Drs. Garza-Vale, Mattox, and Gates
stressed that the second significant bleed should have caused concern and
indicated a more serious problem that required further investigation.  








Dr. Garza-Vale testified that, regardless
of which vessel the defendants believed to be bleeding, any arterial hemorrhage
of the magnitude experienced by Tate is significant, and arterial bleeds of
that type will recur if not properly treated. 
He stressed that the erosion of the bone between the ICA and the
sphenoid made it more likely that an artery could be injured in the process of
cleaning out the sinuses.  When a patient
has had two significant arterial bleeds from the sphenoid sinus area, the patient
likely will rehemorrhage.  Therefore,
Tate=s final bleed was a foreseeable
event.  

Dr. Mattox testified that when the
defendants encountered abnormal arterial bleeding in the sphenoid sinus, it
should have signaled that further investigation needed to be conducted.  Dr. Mattox interpreted the surgical notes of
Drs. Burke and Brandt as indicating that they knew they had a bleeder in the
area of the ICA, though they did not think it was the ICA itself.  If the bleeder was possibly part of the ICA,
attempts at cauterization could cause some damage.  Dr. Mattox testified that after two such
significant bleeds from the same place in the lateral wall of the sphenoid
sinus, there was a risk of bleeding again because (1) inflamed, infected tissue
does not have the same healing capacity as normal tissue, and (2) the bleeding
was in a very critical area.  He opined
that if they did not know exactly where the bleeding was coming from, it should
have been investigated further. 








Dr. Gates acknowledged it was reasonable
on the occasion of the first bleed for appellants to not be concerned about the
ICA.  However, the second serious
bleeding incident changed everything, and appellants should have been alerted
to the possibility of larger potential problems.  He opined that because the ICA was bare,
there was nothing to protect it from the effects of the monopolar cautery, and
the location of the bleeding, as described in the medical records, indicated
the doctors knew they were using cautery tools in close proximity to the
ICA.  Therefore, the risk of aneurysm or
rupture was very high.  When there is a
serious bleed in the region of a major artery such as the ICA, that is a warning
sign to do something, and the end result of another massive bleed was foreseeable.  

We conclude there is more than a
scintilla of evidence to support the jury=s finding that the harm to Tate was
foreseeable.  Accordingly, we hold the
evidence is legally sufficient to support the finding.

The medical records admitted into
evidence show that during the first surgery, Tate lost approximately 200-250
cc. of blood, and during the second surgery, he lost approximately 200-400 cc.
of blood.  While the experts universally
agreed that this was a significant amount of blood to be lost through the nose,
experts for appellants disagreed that it was massive epistaxis and, thus, a
warning bleed.  Dr. Ansell testified that
in his opinion, there was no reason for appellants to have worried that Tate
was going to come back with a more significant, possibly fatal hemorrhage.  He explained that a warning bleed is usually
massive and requires packing to control; in Tate=s case, Dr. Zane easily controlled the bleed with
cauterization.  Had this been a warning
bleed brought on by damage done to the ICA during the first surgery, he
believed Dr. Zane=s effort to stop the second bleed would
have resulted in an immediate rupture of the damaged ICA.  Had Tate made it to the hospital with the
third bleeding episode, Dr. Ansell would have performed an angiogram, but he
did not think one was called for after the first two bleeds.  In his opinion, it was reasonable for
appellants to conclude that if Tate rebled, he would have a chance to come back
in for treatment.  








Dr. Brandt testified that while he did
not know which vessel bled on either of the first two occasions, he thought the
probability was low that it would bleed again. 
If Tate did bleed again, Dr. Brandt believed that Tate would have enough
time to get to the hospital.  Dr. Brandt
insisted there was no way they could have foreseen that Tate would have another
bleed and die.    

Dr. Zane opined that the bleed on
October 3 was completely different from a warning bleed.  A warning bleed usually involves a
pseudoaneurysm in the side wall of an artery, but this was a single discrete
vessel.  Although Tate lost a significant
amount of blood, in Dr. Zane=s opinion, the second bleed was not
massive epistaxis, and what happened to Tate was not foreseeable.  

Dr. Bertino testified that controlling a
bleeding vessel such as the one described by Dr. Zane with a bipolar cautery is
a common practice among ENTs and neurosurgeons. 
If the surgeon has been able to identify the bleeding vessel and control
it, there is no need to do anything else, such as an angiogram.  In Dr. Bertino=s opinion, there was no way for Drs. Brandt or Zane to foresee
what would happen to Tate.

We cannot say that the controverting
testimony presented by appellants greatly outweighs the evidence in favor of
the jury finding.  Accordingly, we hold
the evidence is factually sufficient to support the jury=s finding that the harm to Tate was
foreseeable.  The fifth issue of Drs.
Brandt and Zane is overruled.

We have held the evidence of Acause-in-fact@ and Aforeseeability@ to be legally and factually
sufficient.  Consequently, we hold that
the evidence establishing proximate cause is both legally and factually
sufficient.  Dr. Burke=s second issue is overruled.

                                                                      D.  Duty








In his first issue, Dr. Burke contends
that (1) appellees failed to establish that Dr. Burke owed a duty to Tate to
act according to a certain standard of care, and (2) appellees failed to
establish that Dr. Burke breached the applicable standard of care.  

Whether Dr. Burke owed a duty to Tate to
act according to a certain standard of care is a question of law which we must
decide before addressing the substance of that standard.  St. John v. Pope, 901 S.W.2d 420, 424
(Tex. 1995) (citing Bird v. W.C.W., 868 S.W.2d 767, 769 (Tex.
1994)).  AThe duty to treat the patient with proper professional skill flows
from the consensual relationship between the patient and physician, and only
when that relationship exists can there be a breach of a duty resulting in
medical malpractice.@  Id.
at 423; Ramirez v. Carreras, 10 S.W.3d 757, 761 (Tex. App.BCorpus Christi 2000, pet. denied).  

Dr. Burke initially saw Tate on
September 17 for a neurosurgical consultation at the request of Dr.
Brandt.  On September 25, Dr. Burke
performed a bi-frontal craniotomy and cranialization of Tate=s frontal sinus, and assisted Dr. Brandt
in controlling the spontaneous bleeding that occurred at the end of the
surgery.  We consider these actions more
than sufficient to create a consensual physician-patient relationship between
Dr. Burke and Tate.  That relationship
imposed a duty on  Dr. Burke to act as Aa reasonable and prudent doctor@ would have acted Aunder the same or similar
circumstances."  Hood v. Phillips,
554 S.W.2d 160, 165 (Tex. 1977) (citing Snow v. Bond, 438 S.W.2d 549,
550 (Tex. 1969)).  This duty applied not
only to Dr. Burke=s actions during Tate=s surgery, but also to his
post-operative care of Tate.  See
Webster v. Johnson, 737 S.W.2d 884, 887 (Tex. App.BHouston [1st Dist.] 1987, writ denied).








Dr. Burke asserts that because he was
not present at the second surgery performed after Tate was brought to the
emergency room, he was no longer under any duty of care with regard to Tate=s treatment.  We disagree. 
On October 3 when Tate arrived at Spohn Hospital with the second bleed,
Dr. Burke was just leaving the hospital after checking on patients and passed
Dr. Zane on his way out.  Upon later
discovering that Dr. Zane was there to work on Tate, Dr. Burke called Dr. Zane
to discuss both the first surgery and what Dr. Zane could expect to find.  He told Dr. Zane that there were no issues
during the first surgery that would complicate any plan Dr. Zane had to control
the current bleed, and informed Dr. Zane that the first bleed had been a
discrete bleed and he had cauterized it; it was simply a vessel in the lining
of the nose and was not a problem with the ICA or any part of the brain.  He offered to come to the hospital if he was
needed.  Although Dr. Burke was not
present at the second surgery, he remained proactive in Tate=s care. 
See St. John, 901 S.W.2d at 424 (AThe fact that a physician does not deal directly with a patient
does not necessarily preclude the existence of a physician‑patient
relationship.@); Wax v. Johnson, 42 S.W.3d 168,
172 (Tex. App.BHouston [1st Dist.] 2001, pet. denied) (ATexas courts have recognized the
existence of a duty only when the physician was party to a contract for the
benefit of the patient or had taken an active step in treating the patient.@). 
In addition, Dr. Burke saw Tate on October 15 for a follow-up visit, and
scheduled a final follow-up visit for three months later.  We conclude that the physician-patient
relationship persisted between Dr. Burke and Tate, and Dr. Burke retained his
duty to Tate to act as a reasonable and prudent doctor after Tate=s second surgery.   








We have already held that there is
legally and factually sufficient evidence to show that the bleeding vessel was
the ICA or a branch thereof, that an angiogram would have shown a treatable
condition, and that the harm to Tate was foreseeable.  What remains to be determined is whether the
standard of care required Dr. Burke to order an angiogram.  See Gonzalez v. Outlar, 829 S.W.2d
931, 934 (Tex. App.BCorpus Christi 1992, no writ) (noting
that the standard of care must be established Aso that the fact finder can determine whether the physician=s act or omission deviated from the
standard of care to the degree that it constituted negligence or malpractice.@).           

Dr. Garza-Vale, appellees= neurosurgical expert witness, testified
he believed that because all three appellants were aware of the second bleed,
it was the responsibility of all three appellants to decide to perform an
angiogram or a series of angiograms to determine the cause.  He explained that because Dr. Burke was not
at the hospital for the second surgery, he could not criticize him with regard
to appropriate steps to be taken at that time; however, at the follow up
appointment on October 15, Dr. Burke was not only aware of the second bleeding
episode, but the symptoms described by Tate B mild neck pain, tiredness and dizziness, and nausea when standing
up B should have alerted Dr. Burke to
further problems and caused concern that something was potentially wrong with
the vascular system.  Dr. Garza-Vale
acknowledged that while the standard of care for symptoms of that nature alone
do not call for an angiogram, the standard of care for those symptoms in
conjunction with knowledge of the second serious bleed, required further
investigation.  

We consider this more than a scintilla
of evidence establishing that the standard of care required Dr. Burke to order
an angiogram.  Accordingly, we hold the
evidence is legally sufficient to support the jury=s finding that Dr. Burke violated the
standard of care owed to Tate.








Dr. Ansell, appellants= neurosurgical expert, testified that in
his opinion, there was no reason for Dr. Burke to have been present during Tate=s second surgery and no reason to expect
that an ENT would not be able to deal with a bleed in this area.  In Dr. Ansell=s opinion, it was reasonable, possibly important, for Dr. Burke to
have told Dr. Zane that it was not the ICA that bled during the first surgery. 

Dr. Burke testified that, in his
opinion, the area Dr. Zane was working in was not a neurosurgical area.  After the second surgery, he was informed by
his associate that a bleeder was found and controlled and that there were no
neurosurgical issues.  He was not given
any further information and did not inquire any further.  He believed there was no reason to think that
anything had been left out or that anything additional needed to be done.  He was not involved in any discussions with
the family about whether additional tests should be done, and he was never
asked for his input regarding whether to conduct additional tests.  

We cannot say that Dr. Burke=s evidence that the standard of care did
not require him to order an angiogram so overwhelms the evidence presented by
appellees that the jury finding that Dr. Burke violated the requisite standard
of care is clearly wrong and unjust. 
Therefore, we conclude that the evidence is factually sufficient to
support the jury=s finding that Dr. Burke violated the
standard of care owed to Tate. 
Accordingly, Dr. Burke=s first issue is overruled.  

                                             III.  Admission of Expert Testimony

In their sixth issue, Drs. Brandt and
Zane contend the trial court erred by admitting appellees= expert testimony.  Drs. Brandt and Zane assert the testimony was
not reliable under Texas Rule of Evidence 702.








Under rule 702, an expert must be
properly qualified and his opinion must be relevant and based upon a reliable
foundation.[1]  Tex. R. Evid. 702;  E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 556 (Tex. 1995). 
Whether the expert and the proffered testimony meet these requirements
is a preliminary question within the discretion of the trial court.  City of Brownsville v. Alvarado, 897
S.W.2d 750, 753 (Tex. 1995); Robinson, 923 S.W.2d at 556; see also
Tex. R. Evid. 104(a).  In reviewing the trial court=s decision, we look only to whether or
not the trial court abused its discretion by acting without reference to any
guiding rules or principles, leading to a result that is arbitrary and
unreasonable.  Robinson, 923 S.W.2d
at 558; Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241 (Tex.
1985).  An abuse of discretion does not
exist merely if the reviewing court would have ruled a different way under the
same circumstances.  Loftin v. Martin,
776 S.W.2d 145, 146 (Tex. 1989) (orig. proceeding). 








When determining whether proffered
expert testimony is reliable, the trial court must evaluate Athe methods, analysis, and principles
relied upon in reaching the opinion . . . to ensure that the opinion comports
with applicable professional standards outside the courtroom.@  Gammill v. Jack Williams Chevrolet, 972
S.W.2d 713, 725-26 (Tex. 1998).  AScientific evidence which is not
grounded >in the methods and procedures of science= is no more than >subjective belief or unsupported
speculation.=@  Robinson,
923 S.W.2d at 557 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S.
579, 590 (1993)).  However, the role of
the trial court Ais not to determine whether an expert=s conclusions are correct, but only
whether the analysis used to reach them is reliable.@  Gammill,
972 S.W.2d at 728; see also Robinson, 923 S.W.2d at 557 (ARule 702 envisions a flexible inquiry
focusing solely on the underlying principles and methodology, not on the
conclusions that they generate.@).

In examining expert testimony that is
purely scientific, the supreme court has outlined six non-exclusive factors to
help trial courts determine whether such testimony is reliable.[2]  See
Robinson, 923 S.W.2d at 557. 
However, the particular Afactors a trial court will find helpful in
determining whether the underlying theories and techniques of the proffered
evidence are scientifically reliable will differ with each particular case.@  Id.  The Texas Supreme Court has recognized that Athere are many instances when the
relevance and reliability of an expert witness's testimony are shown by the
witness's skill and experience.@  Gammill,
972 S.W.2d at 722.  In these cases, the
factors suggested by the supreme court Asimply do not fit testimony like that
offered.@  Id.
at 724.  Nonetheless, in these
circumstances, the trial court Ais not relieved of its responsibility to
evaluate the reliability of the testimony in determining its admissibility.@  Id. 
When an expert opinion is based on the experience of the expert alone,
the trial court must determine if there is a sufficient connection between the
existing data and the opinion offered, or if there is Asimply too great an analytical gap@ for the expert testimony to be
considered reliable.  Id. at 726
(quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). 








The party offering expert testimony
bears the burden to prove that the witness is qualified under rule 702.  Broders v. Heise, 924 S.W.2d 148, 151
(Tex. 1996); Boren v. Bullen, 972 S.W.2d 863, 865 (Tex. App.BCorpus Christi 1998, no pet.).  The trial court held a pre-trial hearing to
determine whether the expert testimony proffered by appellees was sufficiently
reliable.  At the hearing, the trial
court had for its consideration (1) the curriculum vitae of the experts showing
their qualifications, (2) the depositions of the experts containing the
opinions they were to offer to the jury, and (3) the medical records and
deposition testimony upon which those opinions were based.  The trial court concluded that (1) the
opinions offered by appellees= experts were closely related to their
experience in the medical profession and their observations in the medical
field, and (2) because the opinions were based on objective facts and not
speculation, there was a sufficient connection to make the opinions reliable.          

 In our analysis of the legal and factual
sufficiency of the evidence, we extensively discussed the testimony offered by
both sides, and we agree with the trial court that the expert opinions were
based on the application of their experience in the medical field to the
objective information contained in the medical records of the deceased.  Because the expert opinions are based on the
experience of the experts, the Robinson factors are not applicable.  See Gammill, 972 S.W.2d at
724-26.  However, appellees were still
required to show that there was a sufficient connection between the experts= interpretation of the data contained in
the medical records and the opinions offered. 
See id. at 726.













Our review of the record reveals that
appellees= experts are all highly qualified and
have extensive experience in their respective fields,[3] and that the experts for both appellees
and appellants based their opinions on the objective data contained in the
medical records of the deceased. 
However, while the experts were all working with the same objective
data, they differed in their interpretations of that data.  Appellees= experts understood Tate=s medical records to illustrate an
underlying factual situation different from that deduced by appellants.  We conclude that the differences in opinion
expressed by the testifying experts resulted not from the application of any
flawed methodology, but on their differing conclusions as to the underlying
factual situation.  The resolution of
these factual disputes is within the province of the jury.  See City of Keller v. Wilson, 168
S.W.3d 802, 820 (Tex. 2005).  The jury=s resolution of those factual issues
thereby determines the probative value of the proferred expert testimony.  See Tex. Workers' Compensation Comm'n v.
Garcia, 893 S.W.2d 504, 529 (Tex. 1995) (recognizing that Ajuries have been free to consider
conflicting expert testimony on a particular issue and, using its judgment as
the finder of fact, blend that testimony to arrive at a proper verdict.@). 


We conclude that appellants= arguments against appellees= expert testimony goes to the weight to
be given the testimony, not its reliability. 
Accordingly, we hold the trial court did not abuse its discretion in
admitting the expert testimony proffered by appellees.  The sixth issue of Drs. Brandt and Zane is
overruled.

                                                        IV.  Motion for New Trial

In the seventh issue of Drs. Brandt and
Zane and the third issue of Dr. Burke, appellants contend the trial court erred
by denying their motion for new trial. 
The decision to grant or deny a motion for new trial lies within the
sound discretion of the trial court and will not be disturbed absent an abuse
of that discretion.  Brown v. Hopkins,
921 S.W.2d 306, 311 (Tex. App.BCorpus Christi 1996, no pet.) (citing Jackson
v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983)).  A trial court abuses its discretion when it
is clear from the record that its decision was arbitrary and unreasonable.  Id. 
(citing Simon v. York Crane & Rigging Co., 739 S.W.2d 793,
795 (Tex. 1987)). 








On the third day of trial, the Corpus
Christi Caller-Times published on its editorial page a letter to the editor
written by Jack Modesett, III, one of appellees= attorneys.[4] 
Appellants assert the jury was aware of the editorial, they discussed it
during deliberations, and the editorial influenced their decision.  Appellants contend this constituted (1) juror
misconduct and/or (2) improper communication with the jury.

Whether jury misconduct occurred and
caused injury is a question of fact for the trial court.  Golden Eagle Archery, Inc. v. Jackson,
24 S.W.3d 362, 372 (Tex. 2000); Pharo v. Chambers County, Texas, 922
S.W.2d 945, 948 (Tex. 1996).  To warrant
the granting of a new trial based on juror misconduct or improper communication
to the jury, appellants must show that (1) the misconduct occurred, (2) it was
material, and (3) it probably caused injury. 
Golden Eagle, 24 S.W.3d at 372; Tex.
R. Civ. P. 327(a).  

                                                       A.  Juror
Misconduct

In support of their allegation of juror
misconduct, appellants relied solely upon the affidavit of juror David Garcia,
in which he stated that (1) during the trial of the case, he witnessed some of
the jurors reading newspapers, and (2) during deliberations two jurors
mentioned that they had read something in the newspaper related to the
case.  Appellees assert that Juror Garcia=s affidavit is incompetent under rule
327(b).  We agree.  








Juror testimony is limited to Awhether any outside influence was
improperly brought to bear upon any juror.@  Tex. R. Civ. P. 327(b); see also
Tex. R. Evid. 606(b).  Under this rule, a juror may testify about Aimproper contacts with individuals
outside the jury,@ or Amatters or statements not occurring during the course of the jury=s deliberations.@  Golden
Eagle, 24 S.W.3d at 370.  However, a
juror Amay not testify as to any matter or
statement occurring during the course of the jury's deliberations or to the
effect of anything upon his or any other juror's mind or emotions . . . .@  Tex. R. Civ. P. 327(b); see Golden
Eagle, 24 S.W.3d at 370. 

An outside influence Amust emanate from outside the jury and
its deliberations.@  Soliz
v. Saenz, 779 S.W.2d 929, 931‑32 (Tex. App.BCorpus Christi 1989, writ denied); King
v. Bauer, 767 S.W.2d 197, 198 (Tex. App.BCorpus Christi 1989, writ denied). 
An outside influence does not include Ainformation not in evidence, unknown to the jurors prior to trial,
acquired by a juror and communicated to one or more other jurors between the
time the jurors received their instructions from the court and the rendition of
the verdict;@ nor does it include A[i]nformation gathered by a juror and
introduced to the other jurors by that juror, even if the information were
introduced specifically to prejudice the vote . . . .@  Soliz,
779 S.W.2d at 932.  This Court has explicitly
held that Adiscussion of newspaper articles is not
considered an outside influence.@  King,
767 S.W.2d at 198.  

Garcia=s affidavit stating that other jurors discussed newspaper articles
during deliberations was not evidence of any outside influence, but only
described matters on the minds of other jurors during deliberations.  The affidavit is, therefore, incompetent to
serve as evidence of juror misconduct.  See
Tex. R. Civ. P. 327(b) (stating
that juror=s affidavit Aconcerning matters about which he would
be precluded from testifying@ may not be received as evidence).  Because appellants have submitted no evidence
tending to show juror misconduct, we conclude the trial court did not abuse its
discretion in determining that none took place. 








                                                B.  Improper
Communication

In arguing that Mr. Modesett=s letter to the editor constituted
improper communication, appellants urge us to find that the Apotential for prejudice@ created by the letter was too great a
risk.  

To support their proposition that the
presence of a newspaper article creates too great a potential for prejudice,
appellants rely heavily on Henslee v. United States, 246 F.2d 190 (5th
Cir. 1957), and United States v. Coast of Maine Lobster Co., 538 F.2d
899 (1st Cir. 1976).  We find these cases
to be inapposite.  Both cases involved
mid-trial publicity during federal criminal prosecutions and relied heavily on
the higher standards of conduct imposed on a United States Attorney due to his
special role in the justice system.  See
Henslee, 246 F.2d at 193; Coast of Maine, 538 F.2d at 902-03.  Because the matter before us does not involve
the actions of a United States Attorney, we do not find these cases to be
instructive.

In addition, appellants rely heavily on
the Texas Disciplinary Rules of Professional Conduct.  We note, however, that these rules were Anot designed to be standards for
procedural decisions.@  Tex. R. Prof. Conduct Scope; see
also Primrose Operating Co. v. Jones, 102 S.W.3d 188, 193 (Tex. App.BAmarillo 2003, pet. denied).  We, therefore, apply the standard established
by rule 327(a) of the Texas Rules of Civil Procedure for determining whether to
grant a mistrial based on improper communication.[5]  See
Tex. R. Civ. P. 327(a).








        
   Appellants urge that Mr. Modesett=s editorial was so highly prejudicial
that it establishes prima facie harm sufficient to warrant the granting of a
new trial.  While rule 327 generally
requires that a party must show that Ainjury probably resulted,@ see Tex. R. Civ. P. 327(a), the Texas Supreme Court has
determined that under some circumstances it may be necessary to draw Alogical inferences of prejudice and
unfairness from the overt act itself, for an action or occurrence may be so
highly prejudicial and inimical to fairness of trial that the burden of going
forward with proof of harm is met, prima facie at least, by simply showing the
improper act and nothing more.@  Tex.
Employers' Ins. Ass'n v. McCaslin, 317 S.W.2d 916, 921 (Tex. 1958).








However, cases where courts have found
prima facie harm involved social interaction with jurors which, while under
normal circumstances may constitute no more than common courtesy, may have a Atendency to create a feeling of
obligation such as should not be permitted between litigant and juror in the delicate
matter of the trial of a lawsuit.@  Tex.
Milk Prod. Co. v. Birtcher, 157 S.W.2d 633, 634, 636-37 (Tex. 1941)
(finding prima facie harm where party purchased soft drink for juror at store
across from courthouse); see also McCaslin, 317 S.W.2d at 921 (finding
prima facie harm where party went to place of employment of juror and said
"Be sure and do all you can to help me"); Tex. Employers' Ins.
Ass'n v. Brooks, 414 S.W.2d 945, 946-47 (Tex. Civ. App.BBeaumont 1967, no writ) (finding prima
facie harm where juror requested and received ride home from plaintiff after
both first and second days of trial); Occidental Life Ins. Co. v. Duncan,
404 S.W.2d 52, 53 (Tex. Civ. App.BSan Antonio 1966, writ ref=d n.r.e.) (finding prima facie harm
where plaintiff asked juror for aspirin, thereby Aconveying to the juror that he was in pain and needed the aspirin
to relieve his pain@). 
The presence of Modesett=s editorial did not involve any personal
contact between the attorney and the jurors, nor did it confer any type of
special favor or attention.  We conclude
that the bare presence of the editorial in the local newspaper is insufficient
to establish prima facie harm. 

The only evidence presented by
appellants to show actual harm was the affidavit of juror David Garcia, which
we have already concluded is incompetent to serve as evidence.  Appellants have failed to provide any
evidence that they suffered injury. 
Therefore, we conclude that it was not an abuse of discretion for the
trial court to deny appellants= request for a new trial. 

The seventh issue of Drs. Brandt and
Zane is overruled.  Dr. Burke=s third issue is overruled.

The judgment of the trial court is
AFFIRMED.       

 

FEDERICO G. HINOJOSA

Justice

 

Dissenting Opinion by Justice Castillo.

 

Opinion delivered and filed this

the 8th day of June, 2006.











[1]  Appellants do not challenge the
qualifications of appellees= expert witnesses.  





[2] The six non-exclusive
factors listed by the Texas Supreme Court are: 
(1) the extent to which the theory has been or can be tested; (2) the
extent to which the technique relies upon the subjective interpretation of the
expert; (3) whether the theory has been subjected to peer review and/or
publication; (4) the technique's potential rate of error; (5) whether the
underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and (6) the non‑judicial uses which have
been made of the theory or technique.  E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).

 





[3] Dr. Garza-Vale is board certified
in the area of neurosurgery and has been a neurosurgeon with the Texas
Neurosciences Institute for 17 years.  He
has extensive experience with surgeries involving the sinuses, and has operated
in conjunction with otolaryngologists in procedures similar to the one at
issue.  In his practice he regularly uses
MRI and CT imaging tests, and interprets the films himself.  

 

Drs. Mattox and Gates are both
board certified in the area of otolaryngology, and have served on the editorial
boards of scholarly journals and published numerous scholarly articles.  Dr. Mattox has served as a professor at the
University of Texas Health Science Center in San Antonio and at Johns Hopkins
University School of Medicine.  He is
also a member of the American Academy of Otolaryngology and a Fellow of the
American College of Surgeons.  At the
time of trial, he was serving as the chair of otolaryngology and neck surgery
at Emory University, teaching medical students and residency programs.  

 

Dr. Gates started the
otolaryngology department at the University of Texas Health Science Center in
San Antonio where he served for 18 years. 
He has also served as an instructor of otolaryngology at the University
of Michigan, Chairman of the Department of Otolaryngology and Director of
Research at Washington University School of Medicine in St. Louis, and as a
professor of otolaryngology at the University of Washington School of
Medicine.  He has been honored by the
American Academy of Otolaryngology, Head and Neck Surgery.  He is a member of numerous professional
societies, has edited textbooks in the area of otolaryngology, and frequently
lectures on topics in the area of otolaryngology. 

 

Dr. Hackley received his medical
degree from Ohio State University in 1976. 
After completing his internal medicine residency and internship at the
University of Cincinnati and Good Samaritan Hospital in Cincinnati, Ohio, he
moved to Dallas where he practiced emergency medicine for three years.  He operated a private practice in internal
medicine from 1981 through 1993, after which he once again began practicing
emergency medicine.  

 

Dr. Bux is board certified in
anatomical pathology, clinical pathology, and forensic pathology.  He has been the deputy chief medical examiner
for Bexar County since 1992 where he spends most of his time working to
determine the manner and means of death. 
He is a member of the National Association of Medical Examiners and a
Fellow of the American Academy of Forensic Sciences.  He has served as an instructor for EMTs and
paramedics in San Antonio, and is a clinical assistant professor with the UT
Health Science Center.  In addition, he
has served on the editorial board of the American Journal of Forensic Pathology
and Medicine, and has published works in his area of specialty. 

 





[4] The text of Modesett=s letter provides, in relevant
part, as follows:

 

The major problem [in medical
malpractice cases] is that many physicians do nothing when they become aware of
malpractice or of a physician who simply provides bad care.  The failure of the medical community as a
whole to discipline its own ranks is at the heart of many malpractice
cases.  Physicians can and do [commit]
malpractice regularly with no repercussions other than increased malpractice
premiums.  The repercussions for the
patients are far more severe and often result in death. 

The malpractice problem is further
exacerbated when fellow physicians fail to come forward and honestly testify in
malpractice cases against malpracticing doctors, even when the malpractice is
obvious.

 

The problem with medical malpractice in Corpus
Christi and indeed the nation as a whole is not with the number of lawsuits,
but with the number of malpracticing doctors.





[5] In resolving this issue, we express
no opinion as to the propriety of Mr. Modesett=s editorial, or any other publicity
occurring during the trial of this case, under the Texas Disciplinary Rules of
Professional Conduct.